Ross Development Corporation v. Fireman's Fund Mr. McQueeny Thank you, Your Honor. May it please the Court. My name is Chip McQueeny. I'm here representing the appellant, Ross Development Corporation, in this insurance coverage dispute. What we basically have here is a CERCLA lawsuit, which recently was appealed to this court. Who are you representing? Ross? Ross Development Corporation, who was the owner of the site between 1906 and 1966. Are we... Yes, Your Honor, I understand. Basically, what we have here is the environmental contamination case, if you will, the CERCLA case, has been appealed to this court. Early on in this case, Ross Development Corporation was pulled in as a third-party defendant by PCS Nitrogen, Inc., which is here represented by counsel. At that time, Ross placed its insurance companies, Fireman's Fund and USFIC, on notice of the claim and asked them to defend. And USFIC claims we did not ask them to defend, but the letter in July of 2007 to Ms. Utz actually requests that all the insurance carriers be placed on notice and asked to defend the case. FFIC initially defended the case under a reservation of rights, and then in, I want to say July of 2008, pulled the defense. They initially defended in November of 2007, I believe it was. Pulled the defense under really one theory, which is that the site was not an insured premises. Nothing in their letter withdrawing the defense of Ross in that case indicates that anything changed between the time that they initially agreed to defend Ross and the time they withdrew the defense of Ross. But they did rely on this idea that the site was not an insured premises in the policy because it was not contained within the declarations of the policy. As has been pointed out in this litigation, the insured premises includes premises alienated by the name insured. And FFIC has known from the beginning that the insured premises, or that Ross, then known as Planners, alienated the site. So it is a covered premises. FFIC did not rely on the pollution exclusions in the policy, which is the basis the district court granted summary judgment to FFIC, really until after the fact, after the declaratory judgment. If the insurer gives the wrong reason, has a valid reason, but makes a mistake about the reason, that it's not going to ensure that that constitutes bad faith? I don't think that specifically constitutes bad faith. I think here you have the further idea that nothing changed. Clearly, FFIC thought they might have a duty. They were wrong. They were absolutely and completely wrong. And is that bad faith? And baselessly wrong, Your Honor. I think they were baselessly wrong. You would be surprised how often lawyers and people are wrong. Yes, Your Honor. There are two sides to this. So somebody was wrong. So they were wrong in the basis that they gave for not insuring. Correct. Does that, just that fact, make them have bad faith? Just that they're wrong, no. Absolutely wrong. There's no basis. But wrong without doing the proper investigation or without facts supporting the basis that you're wrong is bad faith. Do you think they're correct on their ultimate conclusion that there's no liability? I don't believe. There's no coverage. I think under South Carolina law, the decision on the duty to defend is made at the time. Let's say they're just absolutely right on the ultimate thing, that there's no duty to defend and there's no coverage, but they give the wrong reason for it. Is that bad faith? If it's in bad faith. If it's baseless, I think it is bad faith, Your Honor. What case supports that proposition? I believe it's bad faith. I think the Tiger River case and several other cases. They have a fact situation like this, that there was no duty to defend and there is no coverage, but they gave the wrong reason for saying there's no coverage or no duty to defend. I think they gave the wrong reason without basis for that wrong reason. Those cases are exactly like that. Correct. I think they are. Not exactly. Obviously, there are different . . . We're getting into the middle of a subjective test, aren't we? That's hard. It's hard to do. Why shouldn't the area be more objective in the sense of what the policy itself, objectively and by its own terms, obligated the insurer to do? We're talking about shifting positions or bad faith or what have you. During the underlying CERCLA litigation, Ross and PCS, certainly, was describing this pyrite slag as waste because they were trying to get Ross, I guess, to pay a larger share of the response costs. I'm not sure that we can back away from that in the insurance prong of the litigation because if you start describing it as waste, or I guess it was PCS that described it as waste, that brings it within the terms of the exclusion. Your Honor, I don't believe it does. I think waste was used in sort of a technical aspect at that time. During the CERCLA hearing . . . Doesn't the exclusion cover waste? The exclusion covers waste as long as the dispersal release or escape is not sudden and accidental. I think here it was sudden and accidental. It was not intended or expected because the discharge is the subsequent leaching of the contaminants into the groundwater and into the Ashley River, not the placement of slag on the site. In the underlying CERCLA litigation, Ross was required to pay a substantial part of the response costs and PCS was required to pay some of the response costs. The reason they were required to pay the response costs is because they were responsible for pollution. So doesn't it put the underlying CERCLA litigation at odds with the insurance litigation if we say, oh, yeah, they were responsible for the response costs under CERCLA, but when we get to the insurance part of it, oh, well, no, it's really not a pollution. It's not a pollutant, despite the fact that the response costs under CERCLA are tied to pollutants. I mean, it seems to me one of the problems I have is we're going to meet ourselves going and coming. Your Honor, the pollutants at the site were arsenic and lead, not pyrite slag or pyrite cinders or whatever you want to call it. The fact that PCS referred to it as waste, number one, the court in the CERCLA action in the final order, the second amended order and decision, said it's not waste. It was used on the premises to line roadbeds. I thought there were findings in the underlying CERCLA litigation that this pyrite slag or whatever, the parties fiddle around with the terminology in it, but for purposes of reference, I'll call it pyrite slag. I thought that there were findings in the underlying CERCLA litigation that this was the chief source of contamination at the property, and if those findings were made in the CERCLA litigation, how does it fall outside the scope of the exclusion? The source of the contamination was arsenic and lead, which the pyrite cinders or slag... That's not what the finding didn't deal with. That's not what the finding in the underlying CERCLA litigation said. I believe it is, Your Honor. I believe the cleanup is driven by the fact that the pyrite slag and pyrite cinders, which Ross didn't know at the time, would, when mixed with water, disintegrate and spread throughout the site. That wasn't known at the time, but the cleanup is driven. There's no reason to take out the pyrite slag if it's not touching water and disintegrating into its component parts and spreading across the site, spreading into the groundwater, and spreading into the Ashley River. The cleanup... You've decided to divide up your argument in this way. Yes, Your Honor. I can understand why, but let's hear from... Thank you, Your Honor. Mr. Ginsburg. Good morning, Your Honors. If I can start with that issue of... Wasn't PCS referring to this in the Ross litigation as waste because you wanted Ross to pay those response costs? What we were trying to establish in the underlying litigation, the CERC litigation, was that the material that was causing the contamination at the site was there because of Ross's operations. Absolutely. There's no question about that. The point is that the policies do not have an exclusion that says we don't cover pollution from whatever cause. We cover pollution that's unintended. That's the give back and the pollution exclusion. And so the CERCLA has a strict liability standard. The pollution exclusion is not a strict liability standard. And, in fact, what the insurers are trying to do here is take conduct from 1906 when Ross's predecessor planners took essentially rock. I mean, slag is simply pyrite that's burned. It's fool's gold. It's burned to release the sulfur. Now you have rock left over, and they put it on the ground. They used it to build roads, and they used it for fill. There was no bad conduct involved in that. It was simply an operation, a part of their operation. As a result of that filling of the property and the use of the slag. It's not whether they were good or bad. It's whether they intended a discharge. Even if the discharge produces unintended damage at some further point along the road. I mean, you'd cut a big hole in the CERCLA if you say not only did you have to intend the discharge, but you have to intend and foresee the pollution that would arise from the discharge in order to be on the hook for response costs. That can... That carves a pretty big wedge in the CERCLA. And that's the point I was getting to, Your Honor. We're not trying to carve a wedge in CERCLA. This isn't about CERCLA response costs and who's liable. It's about whether the insurers who agreed to provide coverage for liabilities, for negligence, for damage caused by operations of Ross, or Ross's predecessor, whether they have liability to Ross. This isn't about whether Ross has to pay the CERCLA costs. This is about whether the insurers have a duty to pay for Ross's costs, whether they have a duty to indemnify and defend Ross for those liabilities. And that does go to the issue of whether Ross had any intent, knowledge, awareness, expectation when they put this material on the ground that it would cause damage. But Judge Wilkinson's question was, or I took this as part of the question or comment, is that talking about the discharge here is the release of all waste materials, not just the contaminants, and not with any intention that they contaminate. And that's a view that you don't espouse, but I think that's what discharge or release means in the policy. And if that's what it means, then, you know. Well, the policy requires that there be a discharge or a release of a waste material. Right. So the first question is, and it's a fact question, is whether this is a waste. The exclusion says arising out of the discharge. There's an exclusion for property damage arising out of the discharge of, and then they give a number of specific things, and then they say waste materials or other irritants, contaminants or pollutants. And why doesn't that exclusion just fit this case? Well, let me tell you why it doesn't fit this case, Your Honor. Let's start at the... You're going to put on your thick grammarian glasses. I'm not going to play games with the words. The words are what they are. But if you think back to the broader picture of what the insurance policy does, it provides coverage for an occurrence. That's the first trigger. This is an exclusion. The grant of coverage is for an occurrence, meaning bodily injury or property damage during the policy period caused by the operations of the insured. That's the occurrence. And so first we have to look at what is the property damage that is being triggered here. What claim is there? What occurrence is there? And the property damage occurs decades after the pyrite is placed on the ground when the site conditions interacting with the pyrite cause leaching of lead and arsenic from the pyrite. So that's when the property damage actually occurs, and that's when the policies are triggered. It's not the placement of the pyrite on the ground that causes the damage. It's not the occurrence. It's, in fact, the leaching of the pyrite, the lead and the arsenic, the components of the pyrite, onto the ground. And so that's an enormous distinction. If you read the Pat's case, which we cite in our brief, it talks about what we call a double discharge. That leads you to what? It leads you to the next point. It leads me to the next point, which is then you look and say, all right, does the pollution exclusion apply to that second discharge, to the release of the lead and the arsenic from the pyrite? And the answer is it doesn't because the lead and the arsenic, under South Carolina law, under Greenville County and Helena Chemical, sudden means unexpected. So was the release of arsenic and lead from the pyrite, from the slag, was that unexpected and accidental? And the answer to that is either yes, either no, it was not, excuse me, either it was unexpected and unintended. The language of this exclusion is in the negative, so it gets complicated. But it's either unexpected and unintended or accidental, or we have a fact question. And there are a series of fact questions. There are fact questions about whether this is waste. There was no trial. We don't have a record from the underlying case. What we have is affidavits. We have a number of statements of both experts on the insurer's side and on the policyholders. The whole underlying case is somehow irrelevant to the insurance aspect of it. Oh, no, not at all, Your Honor. The underlying case is about strict liability because they put the stuff on the ground. In other words, the contamination at the site results from planter's operations. So from a circular standpoint, planter's is liable. And that's what this court found. That's what Judge Monson's opinion says. They have this affirming the district court. They're liable because they put the stuff on the ground. We're not talking about whether the insurance companies have an obligation to planters, to Ross, because they agreed to insure Ross for liability arising out of Ross's operations. It seems to me you're trying to import some elements into the language of the exclusion, which I'm not sure they are. One is you want foreseeability or that your client has to have foreseeability or that your client has to have evil intent in order for this exclusion, this pollution exclusion, to apply. And I don't read an intent requirement in that exclusion, and I don't read a foreseeability requirement into the exclusion. It just addresses property damage arising out of a certain activity. It addresses a fact and a consequence, not the state of mind of the insured or the clairvoyance of the insured. It addresses a fact and a consequence of the fact. That's the problem I'm having. And, Your Honor, what South Carolina, the Supreme Court, tells us in Helena Chemical is you have to look at the words sudden and accidental and read them as unexpected and accidental. And when I read the word unexpected, I don't know how you make that anything other than a subjective question. No, because there is an exclusion which is more specific, and the specific governs the general, and the exclusion speaks to the specific situation before us here. No, that's what I'm saying. The words in the exclusion, there's the exclusion, and then there's the exception to the exclusion. There's the give back. So the exclusion says we don't cover these kinds of polluting events, except we're going to cover them if it's sudden and accidental. And the Supreme Court says sudden and accidental means unexpected and accidental. But what has to be sudden and accidental? You maintain that the sudden and accidental has to be the property damage, but that's not what I read the cases as saying. It says the sudden and unexpected is the – I think that that's wrong. I think that the unexpected discharge of the pyrite slag is not an issue. It is an issue, and not the damages arising from that. And that's what you say has to be sudden and accidental, the damage that's arising. And that's just not the way I read the law. In a pollution exclusion world, there are three categories of state decisions. There are the ones that say it has to be temporarily sudden, it has to be quick, it has to be an explosion. There's an intermediate step, which is where I think South Carolina law is, which says that the discharge has to be unexpected. And then there's a third, which says that the damage has to be unexpected. And can I just – Could you explore that on rebuttal? I mean, we do have – this argument time has been – Can I just – I apologize. I just want to respond to Judge Motz on the issue. What we're saying is that you have to look at the relevant discharge, and you have to determine whether that relevant discharge or dispersal or release is unexpected. And here it's not the pyrite. The pyrite is inert material that you're putting onto the ground. And it's not until it interacts with site conditions. There's pyrite on the ground there that's not doing anything but sitting there. Why don't you, if you want to add, don't add editorial comment and just answer a question. I'm sorry, Your Honor. I apologize. I'll wait for rebuttal then. Thank you. All right. Mr. Cotula. May it please the Court. Michael Cotula for Appellee Fireman's Fund Insurance Company. You know, one of my partners sometimes puts on an English accent and refers to me as Mr. Cotula. So it's funny. And Judge Motz, actually, I think this man worked at the state court, Jim Aosa, as a clerk in the court. I know you probably see so many clerks. That's a long time ago. I'm sure. And I'm going to talk about some things that go back a little ways, including a decision that you wrote, that you participated in, Judge Shedd, in Liberty Mutual versus Triangle Industries. You win. So I must say that this court had the same reaction as Chief Judge Seymour in the district court to the gyration from the underlying circler case that PCS took in which Ross disposed of this waste fill. They dumped it in the site. They massively contaminated the site. By 1933, everyone agrees it was all intentional that they placed this . . . Go to the policy language. Isn't that what you say controls? Absolutely. Let's go to that. If you want us to think they're bad, we might think that. But let's just go to . . . Right. But then what they wanted to do in this case is PCS turned around and said, Ross wasn't so bad. Tied into the policy language. You want to do that? Exactly. In Triangle Industries, this court made the distinction between the pollution exclusion focusing on the expectation or intent of a discharge of from the occurrence language. There's a grant of coverage in the policy in the insuring agreement for property damage caused by an occurrence, which is an accident neither expected nor intended from the standpoint of the insured. So the damage to be an occurrence must be unexpected and unintended from the standpoint of the insured. The pollution exclusion then takes away from that grant of coverage. So even though there may be unexpected damage from the insured's standpoint, the pollution exclusion says, if the insured intended or expected to discharge a waste material or a pollutant, and the property damage arises out of that. And you could say it's caused by, but for test, that if it arises out of that discharge of waste materials into our upon the ground, there is no coverage. And there's a restoring provision to this broad pollution exclusion. If the discharge disperse or release or escape is both sudden and accidental and they have to establish. Your point is, but that the discharge must be a sudden and accidental. And here it was conceded that the discharge, not whether the property damage precisely. And that's what this court held in Triangle Industries. That is the majority rule in the United States in, in many circuit courts, we cited district court decisions, state high courts around the country. And bring it back to South Carolina, the Helena chemical Supreme court decision, the most recent pronouncement from the South Carolina Supreme court, the 2004 decision. They haven't addressed the pollution exclusion since was that the focus is on the discharge that we must. Essentially that we must determine was the discharge in that case of pesticides expected or intent or accidental. And here it's been conceded by everyone that the placing of the pirate waste, the dumping of it, if you will, was intended. Well, I'm interested in, in having some consistency between underlying circle of law and insurance law and pollution exclusions. And I, I think it credits the legal system to have to when, when something is so plainly the cause for response costs under a circle of because of extensive pollution and extensive damage that it seems to me it would, it's better from a standpoint of consistency to have it line up with the terminal terminology and the pollution exclusion. And it just would seem to me hard to rationalize a holding that said we've got both Ross to a large degree and, and PC P P PCS to a somewhat lesser degree liable for response costs because of extensive pollution and then turn around in the insurance leg of say, and Oh yes, this isn't, this isn't a pollutant somehow. And I don't, I don't know, you know, I don't know how you tie the knot there. I, I don't, there has to be a consistency in the response of a, of a legal system to what happened here. Well, I agree judge and I think words have to have meaning and when someone utters a word and they utter it in a legal proceeding as they did before chief judge Seymour in the circle of case that that word has to, has to have the same meeting when they come in before judge Seymour in the circle of case. And I think it's important to understand that when, when you're debating response costs, each party has an incentive to say, look, the other party really polluted that when you're talking about the division of response costs. And then the incentives become different when you enter the insurance phase where you're trying to say, no, this isn't. And so we're out of this, out of the scope of the pollution exclusion. But the point is, I think you, you can't just switch your argument and you can't just pivot and turn on a dime and an offer diametrically opposed views in the underlying circle litigation. And then when the incentives shift, the monetary incentive shift take a night and day view of it, there's gotta be some judicial estoppel in, in involved in this or something like it. I think that was what was on the minds of the district court. You're free to argue this stuff and on the response cost phase with it. But then I think you're stuck with it. And I agree judge Wilkinson that you can look at this one of two ways. You can say, don't come before me as a court and tell me that something isn't a waste material when out of your own mouth and in your own papers, you uttered it. You called witnesses, you presented expert reports, you gave interrogatory responses and deposition testimony, and then come before me and say it doesn't have a common speech. Meaning when we interpret the word waste in the pollution exclusion, I took Mr. Ginsburg, you may disagree with him. I didn't take Mr. Ginsburg to be making that argument. I think he said it three or four times. That's what an argument he was making. He says, at least as I understood his argument, you might want to respond to it. He said, we're not saying it wasn't pollution for purposes of circle. He's not making that argument. He makes the argument that under the policy language, pollution matters as to how, when, where, and how suddenly it occurred. I think that's what argument he made. That has nothing to do with a position. Somebody took in an underlying circle action. Does it, does this argument do you think it does? It does. He actually took the position in this case, in his briefs, that this pyrite slag material that was generated from 1906 to 1933 or thereafter, wasn't waste material. He cited dictionary definitions. Where he put on the, you know, the reading glasses, and the court looked at the definitions in the dictionary as well. The court looked at everything. This is one of those rare cases where we have a, we have the same judge from the circle case deciding the insurance case. She issued all these findings of fact in the circle case that bind those parties. They litigated it fully and fairly. They spent millions of dollars litigating that case. 16 days of trial. Could you have, could you, let me ask you a hypothetical. Could you have something that everybody agrees is pollution, is pollution, but yet the insurance, in one case, there might, there would be insurance coverage, and another case there would not be insurance coverage based on the language of the policy. Is that even possible? Well, the only thing I can... The answer would be yes or no. The answer is yes if I understand the question. Wait a second. What about the question don't you understand? Well, for example... Both parties have agreed that that is pollution. There is pollution that caused the damage. It's pollution. But one side argues under a specific provision of the policy there is no insurance coverage for that pollution damage, and the other side says you're misreading the policy. Isn't that possible? Yes, that happens all the time. Isn't that what this case is about? That one party is misreading the policy? Absolutely. Well, that's what the policy says. Yeah, I mean, it's fundamentally a question of law about the discharge damage distinction. We say the focus of that exclusion is on the discharge. They say that it's the subsequent release that ultimately causes harm that they didn't expect. And they went so far as in their briefs to say if they didn't expect the harm from their disposal practices of waste at the site that it is covered under the policy. Do not our precedents address just that distinction? I'm sorry? Do not our precedents address just that distinction? Precisely. The Triangle Industries decision is clear. It's actually one of the seminal cases cited around the country by other circuit courts and district courts in published opinions. It's mentioned at length in the treatises on insurance issues. And it's from this court, Liberty v. Triangle Industries, which quite clearly said you can not expect harm and yet know you did a discharge. And in the trial court, Mr. Ginsburg said to the court, nobody from PCS is saying there wasn't an intentional placement of this pyrite slag. So how has it become sudden and accidental? That's the nub of it, isn't it? Absolutely. Absolutely. So some of the issues become repetitive when we look at the absolute pollution exclusion, which goes even beyond. It doesn't have an exception to restore. This clearly was a disposal. It was referred to as a disposal by PCS in the underlying case, and it was found to be a disposal of waste materials by Chief Judge Seymour. So that provision also applies. Do you have anything very briefly to say about these other arguments, particularly the damages, whether the policies cover damages resulting from the 63 acid plant fire? You know, it's clear that there was a fire in 1963, and Fireman's Fund issued its first policy covering Ross in 1973, 10 years later. And we have the benefit that Chief Judge Seymour made the findings of fact about the existence of the contamination at the site. She found there was CPAH contamination, but she also concluded that it was basically bound in the soil. It wasn't affecting the groundwater, and the soil is the property that was either owned by Ross or alienated by Ross, and therefore excluded by the owned property or the alienated property exclusion. There's no coverage under CGL insurance for damage to your own property or property that you later sold. So it has to contaminate the groundwater, and at oral argument before Chief Judge Seymour on summary judgment, this summer, July 2012, Judge Seymour asked that pointed question. What evidence do you have that the fire caused CPAH contamination and that there was new property damage during Fireman's Fund's policies more than 10 years later? We have a finding of fact on the causation point. And their answer was they didn't know, they didn't know of any evidence, and that that was an issue of fact that would have to be ferreted out because they hadn't looked at it. And yet that's something that Fireman's Fund was supposed to know as a fact, that it had caused damage 10 years after the fire. Also, how is the discharge of the smoke in the soot in 1963 from a fire not expected by everyone at the policyholder? Once that fire happened and the smoke in the soot draped across the site, how did they not know it was there? How can they say they didn't expect it in later years? Your basic point in addition to the causation finding is the fact that the policies didn't kick in until long after the fire occurred. Absolutely, and we have the Crossman decision from the South Carolina Supreme Court, which is the most recent pronouncement from the South Carolina Supreme Court, that says the policies only cover for property damage that happens during the policy period. Doesn't cover for property damage happening before, doesn't cover for property damage happening after. While CERCLA may be joint and several liability, insurance is based on damage that happens during your period because that's the contract. All right, thank you, sir. Thank you, Your Honor. Mr. Sever? Thank you, Your Honor. I reserved five minutes. Sorry, Jay Sever for U.S. Fire. I reserved five minutes based upon the discussion. So far, I can't imagine using five minutes, and I can't believe I'm saying that. But U.S. Fire in this is an excess insurer, and the reason I wanted to speak separately is because not only does U.S. Fire have the same pollution exclusion language by incorporation into its excess policies, but these appellants have argued that somehow this excess insurer that I represent has a duty to defend that was breached here. And the only thing I wanted to add to this discussion from what was discussed already is that that is impossible. There is no record establishing a duty to defend in these policies before you. The policies under which a defense was tendered specifically renounce such a duty to defend. They say, shall not be called upon to defend. Of course, that wasn't argued one way or the other. It's not in the record before you unless you take a look at the policies. The language of the policies controls the question of defense. So to the extent this discussion was going to focus upon some argument that any insurer here improperly denied a defense, I wanted to make it very clear that there is no legal predicate to call upon these excess insurance companies, this excess insurance company, to defend this case. Beyond that, we adopt all of the other arguments that the Fireman's Fund has made, and I really don't have any other points to make unless you have any questions for me. Okay, thank you. Mr. McQueen, you have rebuttal time, sir. Your Honor, can I request his additional time? That's a joke. You can request it. I understand, Your Honor. Just real quick on the, I guess, PCS waste issue. In CERCLA, waste is a technical term, and in Helena Chemical, the Court of Appeals said insurance policies are read according to their plain and ordinary meaning. Waste in the CERCLA context is technical. Waste in insurance policies is the ordinary sense, and here there's at least a genuine issue of material fact that the Pyrite centers were not waste. The arising out of language, and I think, Judge Wilkinson, this goes to your concerns, I think that does impose a foreseeability requirement, the arising out of language, under the Hartsville case, which is cited in the briefs. In that case, the issue was whether or not an arising out of an inverse condemnation claim language in a policy precluded a duty to defend a civil conspiracy action that alleged a city and a county conspired to condemn the property. And they said that they strictly construed that against the insurance company. A rising out of in an insurance policy is strictly construed against. They would interpret arising out of, and I think the district court did, as a but-for test, and I would say it's a reasonably foreseeable test. The reason the initial disposal . . . I don't think you really think that, do you? You really think that arising out of is limited by foreseeability? Do you really think that? Well, I don't know if it's limited just by . . . Don't you think it's broader than that? I think it's broader than that, but I think it's the whether . . . Ross and I . . . The district court said this and FFIC says this. Ross does not contend that the property damage has to be sudden and accidental for purposes of the pollution exclusion. It's the dispersal, release, or escape that has to be sudden and accidental. And Ross argues that the dispersal, discharge, or release, or escape of the contaminants occurred when the pyrite slag broke down into its component parts and dispersed across the property. At the same time, that caused property damage at the time of that discharge, dispersal, release, or escape. So I think at some point people got confused about whether or not that's property . . . You know, we're arguing that's property damage, but it's a dispersal, discharge, release, or escape. The danger, though, is we can throw this whole area into confusion, including our own precedent, if we start to unravel the distinction that's been made in the prior case law and that I think is thoroughly supported by the policy between an intentional discharge and an intentional damage. That cuts against the grain, I think, of the policy language, and I think it cuts against the grain of our precedent. If I may finish just real quick. I agree that it would create confusion, but I think here there's no evidence, or at the very least a genuine issue of material fact, that the relevant discharge, dispersal, release, or escape was not intended. It was not expected. The reason the initial disposal is relevant is because if it was expected that the initial disposal would cause a dispersal, discharge, release, or escape of the component parts, then that portion of the pollution exclusion, the exception to the pollution exclusion may not apply, but that is not the case here. There's no evidence that that discharge, dispersal, release, or escape would have occurred at the time of the initial disposal. Thank you, Your Honor. I appreciate it. Thank you, Mr. McQueen. Mr. Ginsburg, you have some rebuttal time as well, sir. Your Honors, this case is so much different than Triangle Industries and Helena Chemical and the cases that the insurer cited. Let me tell you why, and I think it goes directly, Judge Wilkinson, to the point that you've made. In Triangle Industries, which is a 1992 decision of this court interpreting New Jersey law, the court looks at the acts that Triangle Industries was conducting. It was sending sludge to a landfill and then argued it didn't expect there to be releases of sludge to the environment. In Helena Chemical, the Supreme Court of South Carolina says, look, every day these guys were spilling pesticides on the ground. They were spilling chemicals that were contaminants. The contaminant itself was what was being spilled. That's Helena Chemical. What we have here are a series of facts that are completely different. We have an operation in 1906, beginning in 1906, where they're using rock, pyrite. They're taking the sulfur from the rock and they're putting the rock down on the ground. It's still a rock. In fact, it's less of a dangerous rock at that point because it has less sulfur, and it's the sulfur that mixes with the water that causes the acid that causes the leaching, if you do the science of it. And so they're taking this rock and they're putting the rock on the ground. They're using it constructively, to construct, to construct roads, to fill land. In fact, the witnesses in this case, the record in this case, says that they were using it not as a waste but as a useful product after they took the sulfur out of it. The plant manager in the underlying case says the EPA found that the slag was used to stabilize. Could waste be used in a useful way? If it's used in a useful way, I don't think it's a waste anymore. That's the point. No, no, no, that's not my question. I'm saying it's something that everybody considers to be waste, that is waste in the manufacturing process. Couldn't that be used in a productive way? I'm just asking. I'm thinking. I'm not trying to avoid your question. I suppose you could have a waste. It depends. It's sort of a theoretical question is one man's gold is another man's waste. The answer is yes. It seems to me if it's used in a non-wasteful way, it's not a waste anymore. In fact, it becomes a commodity. You're adding a word to the policy. You're adding the word valuable to the policy. In order for the exclusion to apply, the exclusion doesn't apply if the waste is valuable. I don't really read that in the policy. When you read the language, it says waste or other irritant. So the question is whether it's a irritant. Contamination or pollutant. You keep wanting to add. You keep wanting to say. But if the pollutant or the waste is valuable, then the exclusion is rendered inoperative. You're just adding language to the policy that just isn't anywhere around. I just don't think that this was a waste. I think it was the rock that was left over from the process. I don't know how it gets transformed into a waste. The answer to Judge Shadd's question. Something can have a use and it can still be waste. How do you get around Judge Shadd's question? I don't. I'm not trying to get around his question. What I'm saying is that in our case, there's nothing that indicates in this record that this was in fact a waste. It wasn't even a byproduct. This might indicate that they took and threw it on the ground. What else do you do with rocks? You consider it waste and you throw it on the ground. Anyway, I see my time is up. Thank you.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Dennis W. Shedd